May it please the court, my name is Jason Owens. I represent Dr. Gary Stewart and Tamara Lumpkin, a jail doctor and nurse at the Faulkner County Jail in Conway, Arkansas, respectively. This case involves the provision of medical care for an inmate named Broderick Forte who had blood pressure issues and specifically the district court held that summary judgment and qualified immunity were inappropriate for Dr. Stewart and Nurse Lumpkin because questions of fact remained according to the district court. With respect to why Mr. Forte did not receive blood pressure medication sooner than he did, the facts in the record show, and I think these facts are undisputed, that Dr. Stewart, a board-certified physician who serves at the county jail, established a treatment protocol for blood pressure patients, inmate patients. This protocol called for a 30-day monitoring of the inmates blood pressure readings. That indisputably occurred here. He set a high watermark, essentially, for an emergent reading at 180 over 120, at which point if an inmate registered such a reading or higher, then that inmate would be given a blood pressure pill and be set for a visit with a doctor at that point. In addition, as part of this assessment protocol, the doctor would review these readings at least once a week. It's undisputed that all those things happened here. Well, is it also undisputed that the prescription was prescribed on November 5 and he didn't even get a pill till the 18th? I think that is undisputed, Your Honor. That goes into the issue of personal involvement and the question of whether  or not the prescription had not been filled for that time period. Well, somebody did. Well, that's true, but of course, courts deal with questions of the parties to the case and the parties who were sued. We've pointed out both below and here that there was no evidence and that there is no evidence in the record that Dr. Stewart or Nurse Lumpkin were involved in the process of prescription fulfillment. And of course, we know just by our own dealings with medicine that doctors aren't generally involved in the process of prescription. Yeah, but when you're in a hospital, that nurse looks at that chart every four or five hours and the nurse says, oh, these are the pills you're taking. You're taking these pills every four or five hours, not 13 days. This is a nurse. Certainly. Certainly. And I would certainly distinguish a county jail from a hospital setting in the sense that they're just not the same. That nurses deal with far more patients in a county jail than they would be assigned in a hospital setting. That there's no evidence in the record that that was occurring or part of her responsibilities here as opposed to. So you can order it and never give them the pills? No, not never. Okay, how long? He certainly received the pills. I think the evidence in the record shows it was about two weeks. That there was some sort of mix up on fulfilling the prescription that took about two weeks. You know what the Gordon case says and the Plemons case say black letter. Intentional delay in providing medical treatment is deliberate indifference. If a reasonable person would know that the inmate requires medical attention. Well, intentional delay, first of all, and I think it would be intentional delay by one of the parties, not by some third party who had that responsibility. There's no evidence of intent here. No evidence that this was anything other than the normal kind of mix up. We've all had mix ups with our prescriptions at some time. Is there any allegation at all that the this nurse or this doctor were involved in the day to day administering of the medicines? I don't think that evidence appears in the record. How about an allegation? I don't think there's an allegation in the complaint to that effect. I think the evidence in the record shows that the guards actually passed out the medication and that the inmate would then sign for those. Any allegation or evidence that the doctor or nurse would monitor that sort of thing? Follow up and make sure that it was given up. I don't think so, unless that there's certainly not to my knowledge, anything in the record to that effect, and I don't think that would happen unless there was some exception where the guard or the inmate complained or made a remark about it to one of them, that they would be just supervising that process. But I don't think there's any other evidence in the record. The I would come back to the Gordon versus Frank case, which was cited by the district court in support of this notion that an assessment can't deliver the difference can't be avoided by an assessment that is then not complied with. Well, that's I would respectfully say that's that's not what happened here. What happened here is that there was an assessment that that assessment ultimately revealed that this inmate suffered from a particular version of high high blood pressure, and he was thereafter prescribed and medicated. The fault that's that's found with this assessment protocol by apparently by the district court and certainly by the Apple II is that this process took too long or that the emergent level decided upon by the protocol authoring physician was too high. I would respectfully submit. And I think we have some in our briefs that that is a negligence question there. They're arguing about disagreements with the the physicians assessment protocol. Don't we have two different experts who disagree on that question. Well, the Apple II is actually not named any expert witnesses. Both of these doctors that testified treated the plaintiff at other points during his life. The first treated him in 2006, I believe, at which point he was suffering from unmedicated high blood pressure of high readings and the other diagnosed him about 10 months after his release from jail. And they both do make conclusions that we have asserted below or were inadmissible because no report had been made pursuant to rule 26. But those doctors do say that they would have and that Dr. Stewart should have prescribed medication sooner that I can't recall if either of them actually said that the emergent level in his protocol. I don't think either one of them actually said this, that the emergent level in his protocol should have been at a lower figure 160 over 110, for instance, or something like that. Neither of them actually testified that, but they testified that it should have been sooner. The problem with that is that's a malpractice argument. That's an argument that we disagree with the protocol in place. This protocol... Well, couldn't it be an argument, though, that deliberate indifference, that you just willfully ignored the standard of care that's expected? Well, and to follow up on that, I think we have cases that suggest where you have two different experts sort of disagreeing on that, that this court doesn't have jurisdiction at this stage to decide that kind of fact question. Well, of course, I think that you do. And the reason I think that you do is because qualified immunity deals with questions of clearly established law. And that's what we're asserting here, that there's no clearly established law that's ever held that a board-certified physician can't establish and follow his own assessment protocol. That indisputably occurred here. He established this protocol that other experts disagree with, and that's fine. This court has also held that disagreement with a doctor's assessment or treatment protocol doesn't state a claim under Section 1983. And negligence and medical malpractice also don't. The Gordon case cited by the district court is inapposite here because in the Gordon case, the nurse completed her assessment. She completed her assessment, decided that the inmate needed medication, but didn't get him the medication, even though it was heart medication that was needed immediately. And he died that night. That's fundamentally different from this case where the doctor had an assessment protocol in place, and upon completion of the protocol, he saw the inmate patient and prescribed medication. Was a nurse one of the defendants in the Gordon case? No, it was actually the guards in that case. It's only guards in that case, right? Yes. I'm pretty sure, but I want to see if you read it since I read it. Yes, no, it was the guards that were sued in that case, which also makes it different from this case. The guards weren't sued here. It was the nurse and doctor. But it says even guards would understand when someone's having a heart attack and dies in a few hours. Well, certainly. And of course, those aren't the facts here. The facts aren't that this person suffered from any. The only evidence of emergency here are high blood pressure readings. He wasn't diagnosed with this eye problem until 10 months after his release from the jail, almost a year from the time that these blood pressure. He himself complained of vision problems while in jail. He did, but those the doctor reviewed those and examined him physically and found that that didn't exist. I see I'm getting in my rebuttal time. There are no further at this time. I'll say preserve my time. Thank you. Morning, Judge. Morning, Mr. Proctor. Kelly and Judge Benton. May it please the court. My name is Willard Proctor, Jr. And I, along with Mark Leverett, represent the appellee, Broderick Forte, in this case. It's our prayer that this court would uphold the finding of the district court for three reasons. First of all, the district court properly found that summary judge was not appropriate on the issue of qualified immunity. Secondly, it is inappropriate, we believe, for this court to get into the issue of whether or not there was deliberate difference in this case, because we think, in a sense, they would be bootstrapping up jurisdiction at this level when they shouldn't. And then thirdly, even if the court were to get into that, there was deliberate indifference. I'd like to begin, first of all, with the whole issue of whether or not, in fact, there was a, in this case, a denial of medical treatment, which would have led to a denial of the judge's brochure of qualified immunity. There's a two-prong analysis that this court has employed in terms of determining that. And in this case, both of those prongs are met. First of all, as the district court properly cited and said, that, you know, you have to look at the facts in the light most favorable to the appellee, and then determine whether or not there was a deprivation of a constitutional right. Mr. Proctor, and I may be wrong about this, but it's my understanding that part of your claim is that the failure to screen him when he came in was deliberately indifferent. Judge, you're not incorrect. That's correct. There are three basises that we argue were deliberately indifferent. First of all, there was a complete failure to screen when he initially came in. Okay. Is there, is there any allegation or evidence that either of these defendants were responsible for screening? Your Honor, with respect to that, we believe that there was in the sense that these, they were involved in the treatment protocol that was established by the facility. It's our, we have, we are, we're in a strange place in this case. They, we are, there are some discovery issues that we haven't completed yet. They did file their motion, and we are here, and so that there are some things that we've been through. I think we're sort of stuck with the record. We are stuck with the record, right. And there has to be some, for them to be deliberately indifferent, two things come to mind. One, they have to be involved. Right. And two, they have to know of some serious medical condition at the time, first with respect to screening. Right, and here's the problem that we have, Judge. We, for them to even get to the point that they would even be able to provide medical treatment, it's our contention that they would need that as a initial floor as to what it is that they're dealing with. Some of the other doctors, the two other doctors that testified in this case, we asked them questions about why you take a history, what's the relevance of a history, and so they got into all those things. Well, Counsel, what day was he admitted to the jail? 25th of September of 2009. Okay, but by October 5, they're starting a chart of blood pressure, you know. So by October 5, they really were on blood pressure readings. And my clerk says within about a week after he got there, he had a full physical assessment, I think, by the nurse. Is that true? How many days after, I should ask the question, how many days after he got there was it till he got evaluated? Your Honor, we think it's about two weeks before he actually had a medical screening. He did see, he wrote forms, medical request forms. I think within a week he's there, he complained about blood pressure and monitoring began within a week of going there. Is that true or false? You tell me. No, that's exactly true. You're right, Judge Bennett. That's true. How much does it count about the medical screening getting there if within a few days after getting there, they've started a chart of his blood pressure up and down and sideways and readings and all that? Well, the problem is when he came into the facility, we're contending that his blood pressure was high even from a standpoint, they should have been monitoring it all along, and if they had done it properly, not just monitoring, they should have been giving his blood pressure medicine, and that's the problem. See, all they were doing was just assessing it, and an assessment is not treatment, and that's the problem. Just because they knew that he needed blood pressure medicine, they did nothing to help him to facilitate getting the blood pressure medicine, and actually- Well, they wrote a prescription. But Your Honor, that was over 34 days after he was in the facility. November 5th. Right, over 34 days after he had been complaining- Why didn't he get the prescription according to your pleadings and your evidence? It was the fault of the Faulkner County Detention Facility, the doctor and the nurse in these regards. What did they do or not do? What do you say their actual actions were that stopped this prescription getting there for 14 days or thereabouts? Well, here's the thing that they say they did, and this is how we believe they did it. They said that they were monitoring the blood pressure logs on a weekly basis. If they, in fact, were doing that, they would have determined that he did not, and had not gotten his blood pressure medicine, and they were obliged to- No, wait, his blood pressure's going down, you know, during this period of time. It's on a downward tilt, you know, throughout November. Isn't that odd, you know? During this time, they don't get any of the pills, his blood pressure goes down a little bit? I mean, it may just be coincidental. So, if they were monitoring it, they may well have thought that he was getting it. Well, the problem is they were- It was still at an emergent level. I mean, his blood pressure was still- No, their doctor says 180, and it's at 160 going down from the 5th of November through the 18th. It's basically down during that period of time. Respectfully, Judge Bennett, that was stroke level. That's what the two doctors that we had basically said- Yeah, but now you're back to medical malpractice. My question's very simple on the prescription. Is this the fault of the pharmacy? Is this because the legislature didn't give money? What do you say, what do you prove was the reason he went 14 days without the blood pressure pills? It was the doctor's fault, and the nurse's fault, and the facility's fault. It was all three faults. What did they do? Now, often, I gave you my terrible example a moment ago in the hospital. The doctor writes that prescription and doesn't do anything else on it ever again, in my experience. Right, that's true. I mean, next year, six months. Six months, you talk to the doctor about the prescription, or a year later, you talk to the doctor. Right. So, sticking the doctor the prescription sounds crazy. Well, Your Honor, here's the problem. He knew that it was emergent. He knew it was emergent, so he had to make sure that he got that pill. If he didn't, I mean, it's plainly obvious. I mean, if you know a person's at an emergent level under your own protocol, and it's required that they get the pill, that doctor should have gotten him that pill, or made sure he got it. The nurse, by the same token, knew, you know, let's just take their argument that that's the protocol that you're supposed to follow. Well, the nurse knew as well that it was emergent, so she had an obligation to make sure that he got the pill, and the guards obviously- Williams v. Arnold, and it's an 11th Circuit case about getting prescriptions for a person in an Alabama jail. And the conclusion is, at best, the delays suggest that the jail's methods of procuring medicine from the local pharmacy needed adjusting. Even so, this would have been negligence, not deliberate indifference. Do you know about that case? That's a holding of the case. Your Honor, I don't know about that case, but here's the problem that I would have in our case specifically. The doctor knew it was an emergency, and that's the problem. Even though the doctor says it's not an emergency, so it's over 180, and your client's blood pressure is never over 180 while it's being monitored. Well, and I guess that's where we have kind of an issue. The district court, I believe, gave credence to, factually, that the blood pressure was- the level that they were at, or at least that establishment at that 180, was just a monitoring tool and not an actual reading that you should be looking at in terms of whether or not it's emergent or not. So I think that's one of the factual things that we have an issue with. Because I think the district court sided with the two doctors that found that, yeah, that, I mean, 180 is just way out of the question. I mean, where he was, he was at stroke level. So the problem was, is that when those doctors- even though it was going down, it was still at a level where they should have been giving him the medication. And so, it's that they- Who's the they in your sense? I mean, the nurse, I mean, the nurse and the doctor should have, if they were reviewing the charts, both nurse, both the nurse- Okay, now, we know the doctor says he did it every week, reviewed the charts. How often does the nurse say she reviewed the charts? You're the other side gentleman. There are too many people there. They can't look at the charts. Right. Now, how often does the nurse look at the charts? I don't think we have anything in the record to indicate that. Oh, shoot. We don't. The only thing you could look at is just, you could see the times that she actually signed. Sometimes, she actually signed the- where she actually gave him the blood pressure. So, we can assume that when she signed the chart that she did that, but I don't have an actual number that she actually did it. I know that there are some times that she actually took- she actually took his blood pressure. And- How about most of the times it was done by the guards? It was most of the time. But there are some times that she did as well. So, some of those times, we would argue that that was there. We have two other problems, even if we- the problem with the delay is an issue, but just the right out denial is something that they have a problem that they can't get around. I mean, they denied him for 34 days. They failed to give this man blood pressure medicine, which Dr. Chaka, who was a- he is one of the- UAM at University of Arkansas Medical Science, one of the leading institutions in the state of Arkansas, found that this led to- was partially responsible for his blindness. So, the failure to get medical treatment actually caused Mr. Forte to become part- was part of the reason that he became blind. So, there was a consequence for the delay in the medical treatment for those 34 days that the district court found. Now, the issue with regards to whether or not there was a constitutional right, I think that it's clear. He had a right to medical treatment. A pre-child detainee has that right. And then that right was also established in September of 2009. So, there's no reason why the appellees didn't know or shouldn't have known that it was a clear- he had a clearly established constitutional right to medical treatment and it was clearly established at the time. And I think, Your Honor, that's where the inquiry stops. What they try to do is to get this court to go a little bit further and say that there were issues that were intertwined and that they want to get into this whole issue about whether or not the district court was proper and denying the summary judgment on the other issues. But, Your Honor, we just don't think that's appropriate because this court just doesn't have jurisdiction. If you find that the qualified immunity was satisfied, then I don't think we go any further. And then there's the third thing. We said that there are three parts of it, which was we have the assessment, the denial, and then the delay in treatment. So, we would argue that those three things would indicate that summary judgment was appropriate. The other parts of our argument deal with whether or not the denial of the summary judgment was appropriate with respect to the issues on deliberate indifference. And, Your Honor, we just think, again, that you don't get there. There are some things that I'd like to respond to as opposed to going to those arguments if it would be okay with the court. Can we go back to the failure to actually give the prescription? Sure. What is it? What allegation is there? What facts are there that put this nurse and this doctor involved in that process? Okay. All right. Good question. I couldn't find anything in your pleading that said, you know, they were responsible for doling it out or, you know, and failed to do so, that sort of thing. Well, and I think that the actual doling out may be a little bit murky, but the prescription was something that they definitely were responsible for. And the doctor did that. Well, he... I mean, he might have delayed it. That's a different question. It wasn't a delay. It was a flat-out denial. Because what was happening was they were... Let's just give them October the 5th at the best. They knew on October the 5th that he was... He said, my blood pressure is high. I need my medicine. Call my sister. And the nurse said, okay, you know, we will, in effect, call. Well, we had testimony in the record that the family was never called. So that's one thing. Also, the fact that on a... If he was, in fact, monitoring the blood pressure as he allegedly was doing, there were periods of time where the blood pressure was clearly at a level that Dr. Chacko said led to him being blind. And so that's something there. That's the 34-day period. Let's talk about the... I think it's 12-day period. The 12-day, 13-day, okay. Well, during that period of time, again, I think the... Because I see how they were involved in the 34-day period. I don't see how they were involved in the 12-day period. Okay, all right. Here's our argument there. One, that they... We're saying if you were really looking at the medicine log like you're supposed to, you would have actually found that he was not getting his medicine because his... Although the blood pressure readings were going down, it's our argument, and I know, Judge Bender, that you point that out, but the problem is that it was still too high. And that's our problem. Our experts say that he was at a level that it was stroke. He should have been getting medicine anyway. So the doctor, once... He should have been getting... Our doctors say he should have been getting medicine a long time before, but once you prescribe... Once you get around to giving the prescription for the medicine, given where he was, he should have made sure that he got it. And that 34-day period was just too long. And I think our doctors argue that, at least that's part of what it is that we argue about the delay on that regards. All right. I'd like to spend the last minute or so just concluding that we believe the district court's opinion was appropriate. And again, just to bring to the fact that this is a summary judgment, and the light... The evidence is supposed to be taken in the light most favorable to the plaintiffs in this case. And this is not the place where facts obviously would be established. And we believe, based upon the facts in this case, that summary judgment, the denial of summary judgment was appropriate. And we pray that this court would uphold the ruling of the district court. Thank you. Thank you. Council made an interesting statement, which is that assessment is not treatment. But I think certainly assessment is a component of medical care. And that's what's at issue here. Both of the other doctors, even that disagreed with our doctor, agreed that some assessment is necessary to determine the need and type and dosage of blood pressure medication. They simply say that they wouldn't have taken as many blood pressure readings as our doctor. That they, in their normal practice, they stop much shorter than that. That is ultimately a malpractice argument. That is an argument that in this locality, this is the way doctors do things, and he did it differently. The implicit argument that his emergent level was too high is the same argument. It's an argument that a local doctor disagrees with the way he did this. That argument doesn't suffice. With respect to whether this court can get into deliberate indifference, and the question of deliberate indifference, it certainly can. Qualified immunity, one of the components of qualified immunity is whether a constitutional right was violated. And that is the clearly established law to determine whether a constitutional right was violated. So there's not a jurisdictional question here with respect to whether this court can get into the question of deliberate indifference. We've submitted that there's no evidence of deliberate indifference with respect to the doctor. We would submit the same with respect to the nurse. There's no case that stands for the proposition that a nurse can't follow an assessment protocol established by her supervising physician, in this case, Dr. Stewart. And that's the evidence in this case with respect to Nurse Lumpkin, that she simply followed the protocol, instituted the blood pressure log, and when it reached the emergency... But counsel is not following a protocol when the patient's not getting the medication. So that's one thing nurses normally check on. Well, yes, but there's no evidence in the record that the nurse does it in this context. County jail simply runs differently from a hospital. And in this context, there's no evidence that the nurse had any control or responsibility for... How many of the blood pressure readings did the nurse take? What does the record show? I think it was three or four, if I recall correctly. Were they in the period between November 5 and November 18? I don't know the answer to that off the top of my head. I'd have to look back at the log. But certainly she took some, meaning she reviewed the records as well. And there's no evidence that she was doing anything other than following the protocol, which called... Except for not giving in the medication. Well, there's no evidence that that was part of the protocol. That she was... It's prescribed by the doctor. Well, that's... Prescription is a protocol, counsel. Certainly, that's part of the protocol. But no evidence that part of the protocol was that Nurse Lumpkin obtained and administered. There's no evidence of that in this case. And for that reason, we would ask that Nurse Lumpkin be dismissed as well on the basis of qualified immunity. What if this doctor set the emergent levels at 250 over 200? Well, certainly, I think that's the crux of what the court deals with in this case. At some point, this could become deliberate indifference, couldn't it? I think it could. I don't think you can say merely because there's a disagreement. It's a medical malpractice. I agree that there's some latitude in there. Certainly, if a doctor said, I'm going to monitor his blood pressure for two years on some level. But that also assumes that a board-certified physician is going to do something that outrageous. In this case, it was a 30-day protocol, not a three-year protocol. It was a 180 over 120, not 250 over 200. This doctor... But other doctors are saying 180 over 120 is too high. Certainly, but they don't give their... Well, actually, they didn't say that. They said they would have just administered medication sooner. But... Didn't one judge allude to 160? I'm relying on your stuff, so tell me if I'm wrong. I don't recall either of the doctors testifying about... It should have been a lower number. My recall is that they both said, I would have administered, and maybe this doctor should have administered medication sooner. I see my time is out, so no further questions. Thank you. Thank you, Mr. Owens. We appreciate your arguments today.